# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 08-3493

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Neulan Dae Midkiff, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: February 12, 2010
Filed: July 16, 2010

———————

Before WOLLMAN, BYE, and MELLOY, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

Following a nineteen-day trial, Neulan Dae Midkiff was convicted of conspiracy, mail and wire fraud, and failure to file tax returns. He appeals, contending that the district court[1] improperly joined the failure-to-file charges with the other charges and abused its discretion in denying his motion for relief from prejudicial joinder. Midkiff also challenges the admission of certain evidence and contends that his 180-month sentence is unreasonable. We affirm.

———————

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

## I. Background

## A. Midkiff Meets Travis Correll and Invests in Horizon Establishment

In 2001, Travis Correll founded Horizon Establishment (Horizon), a purported investment company. He collected approximately $175,000 from his friends and family to invest with a New Zealand businessman who offered an opportunity to invest in a high-yield international banking program. The program allowed investors to pool funds, which were supposedly leveraged to make multiple loans and generate significant income. Correll invested $100,000, and the businessman absconded with the money. Correll did not report the theft to law enforcement officials and did not inform his investors that their money had been stolen. Instead, he began a Ponzi scheme, using the remaining investment funds to pay dividends and enticing new investors with the promise of substantial returns.

Midkiff was selling insurance products and operating the Shiloh Church in Forest Lake, Minnesota, in 2001. He had heard about Correll and the Horizon investment program through an acquaintance. Midkiff contacted Correll in August 2001, and they met to discuss the high-yield international investment opportunity that Correll was offering. Shortly thereafter, Midkiff met with Correll for a second time and invested $20,000. Midkiff anticipated monthly returns of $1,800. Matt Goers, a pastor at Shiloh Church, accompanied Midkiff to the second meeting and decided to invest $100,000 with Correll. For bringing Goers into the Horizon program, Correll paid Midkiff a $1,000 monthly finder's fee, which Midkiff could expect to receive for the life of Goers's investment.

Midkiff began referring investors to Horizon in April 2002. He received a finder's fee for every investor he brought into the program and also for investors who came to the program through investors linked to Midkiff. The finder's fee was typically one percent of the investment placed with Horizon, paid monthly. Members

-2-

of the Shiloh Church, Midkiff's relatives and neighbors, people within the Forest Lake community, and others heard about the investment program. Some early investors had seen Goers's monthly interest checks. When potential investors approached Midkiff, he explained the investment program and encouraged them to ask current investors about Horizon's monthly interest payments.

## B.  Midkiff Establishes Via Comp Financial

In the spring of 2002, Midkiff established Via Comp Financial (Via Comp) and billed himself as a financial consultant. With Correll's financial assistance, Midkiff secured office space in Blaine, Minnesota, where he met with potential investors. Midkiff generally described the Horizon investment as an international banking program in which an individual's investment would be pooled with funds from other investors until the pool reached $1 million. The pooled money would then be sent overseas to the World Bank. World Bank, in turn, would leverage the investment to lend that amount several times over, thereby generating a high monthly rate of return. Investors were promised monthly interest payments from Horizon at a rate of six to eight percent of their investment.

Investors placed funds with Horizon based on the regular interest payments, Midkiff's explanation of the investment, his purported background as a financial consultant, and his status within Shiloh Church. They entered into one-year contracts with Horizon. At the end of the year, most investors chose to renew their contracts and continue receiving interest payments from Horizon. Although they were allowed to withdraw their principal investment at the end of the contract's term, Midkiff cautioned some investors that they would be barred from further investments with Horizon if they withdrew the funds.

### C.  Department of Commerce Investigates Via Comp

In the fall of 2003, the Minnesota Department of Commerce received a complaint regarding Midkiff and Via Comp.  Jerry Watkins, Midkiff's business associate, had used Via Comp letterhead to send information about the Horizon investment to potential investors.  In October 2003, investigator Deborah Knooihuizen requested information about the investment, the offering, and the investors.  The investigator included a copy of a consumer alert detailing signs of fraud schemes.  Warning signs included excessive guaranteed returns and references to fake financial instruments and the World Bank.  After some initial correspondence, Midkiff responded through his attorney, stating that the investment was his personal investment and that he was not selling any investment products.  Midkiff's attorney declined Knooihuizen's request for further information.  The Department of Commerce closed its investigation.

### D.  Watkins and Midkiff Solicit Investors for West Wing Investment

In April 2004, Watkins formed Central Financial Services (CFS).  Although Midkiff's name was not on the corporate formation documents or the CFS bank account, Midkiff told investors that CFS was his company, and investors believed that Watkins was Midkiff's assistant.

Watkins had learned that Wade West of West Wing Financial (West Wing) was offering an investment program similar to Horizon's.  The West Wing offering involved overseas banking and an eight percent monthly rate of return on a $1 million investment.  Midkiff and Watkins began soliciting investors for the West Wing investment in May 2004, planning to split two percent of the monthly return and pay investors the remaining six percent.  They told the investors that the West Wing investment was separate from the Horizon investment and offered a better rate of return.  Midkiff explained that the $1 million investment principal would be

-4-

"leveraged against," meaning that investors could not lose their principal because it would remain in the bank. After Midkiff and Watkins had secured $1 million from CFS investors, Watkins wire transferred the funds from the CFS bank account to West Wing.

Shortly after completing the wire transfer, Midkiff learned that the Federal Bureau of Investigation (FBI) had visited the Wyoming State Bank and inquired about the CFS wire transfer. According to Midkiff, the FBI was concerned about certain expenditures being made by the wire recipient. Watkins asked West Wing to confirm that the $1 million remained intact, and he received a letter stating that the funds were secure. Midkiff and Watkins began collecting funds for a second investment program with West Wing.

CFS did not receive an interest payment from West Wing when it was due in June 2004. Rather than informing investors, Midkiff and Watkins made supposed interest payments from the funds they had collected for the second program. West Wing made its first interest payment at the end of June and its second payment in August. The August payment was a second-party check payable to Wade West and signed over to CFS. Midkiff and Watkins paid themselves $27,500 each from the second payment. By the end of August, Midkiff and Watkins knew that the $1 million investment had been stolen.

Instead of reporting the theft, Midkiff contacted Correll for advice. Correll agreed to enter $1 million in a standard Horizon contract on behalf of the Joshua Tree Group (JTG), Midkiff's new business entity. Under this scheme, JTG received monthly interest payments from Horizon and Horizon deducted a portion of JTG's monthly return for payment on the $1 million it owed to Horizon. JTG received approximately $134,000 in interest each month, from which it paid interest to the West Wing investors. Midkiff and Watkins replaced the West Wing investor

contracts with JTG contracts and placed the funds they had collected for the second West Wing program with Horizon.

### E.  Department of Commerce Investigates Central Financial Services

Adding to CFS's problems, the Minnesota Department of Commerce issued an order for written statement, production of documents and report of sales to Watkins in August 2004.  The department had received a written complaint that Midkiff and Watkins were selling securities through CFS.  Accordingly, the department sought information related to the investors participating in the CFS investment and the details of the investment.  Watkins provided a copy of the order to Midkiff, and they discussed their response.  Watkins responded to the order through an attorney, who advised the department that CFS was no longer operating.  CFS agreed to enter into a consent order to cease and desist their operations in Minnesota.

Two weeks after the Department of Commerce sent its order to Watkins, Midkiff began forming JTG in the state of Nevada.

### F.  Horizon Stops Making Interest Payments

In mid-2004, Correll decided that Horizon would no longer accept individual investments, but rather would require intermediaries to pool funds for investment in amounts no less than $1 million.  Interest payments would be made from Horizon to the intermediary, who would then disburse the funds to the individual investors. Midkiff utilized an entity called the Padanaram Trust as the intermediary for the first two pooled investment contracts with Horizon.  Thereafter, JTG served as the intermediary and pooled funds for investment in Horizon.

Midkiff and Watkins told investors that JTG investments were separate from Horizon investments, despite the fact that JTG placed funds only in Horizon.  Midkiff

set the rate of return for the JTG contracts, paying JTG investors less than Horizon paid JTG. Midkiff kept the difference to pay for business expenses, his personal income and expenses, and Watkins's income.

Beginning in late October 2004 and continuing for the next few months, checks from Horizon to JTG were not honored because there were insufficient funds in Horizon's accounts. Horizon made some interest payments during this time period, but did not meet its full payment obligations to JTG. JTG continued to meet its obligations to individual investors by paying them from the principal provided by new investments.

Horizon stopped making payments to JTG in March 2005. Midkiff continued to solicit new investors and new investments from current investors, using the new investments to pay interest to JTG's individual investors. Midkiff and Watkins never told JTG investors that the Horizon interest payments had stopped or that there was any problem with JTG's investments. They also did not explain that JTG was using funds that were supposed to be invested to make purported interest payments on the previous programs.

Watkins left JTG in May 2005. He contacted a few JTG investors and advised them to forego making further investments with JTG, although he did not divulge the problems JTG was experiencing. Midkiff called Watkins after learning that he had contacted investors and said that Correll had sent JTG investor interest payments. Midkiff offered to pay Watkins on the investor contracts that he had generated. Watkins received more than $1 million dollars after he left JTG. Midkiff maintained that he was fulfilling his contractual obligation to Watkins, but Watkins believed he was paid to keep quiet.

From March 2005 until the collapse of Horizon and JTG in December 2005, the companies operated on a "reconciliation" basis. Under this system, JTG tracked how

much investment money it acquired for placement with Horizon.  Horizon calculated how much interest JTG investors were owed and subtracted that amount from the new investment dollars.  The difference was the amount due to Horizon.  Midkiff had inquired whether "reconciliation" was a legitimate way to conduct business, and Correll assured him that Horizon's lawyers had approved it.  Amie Black, JTG's bookkeeper, tracked the companies' mutual obligations, but no reconciliation ever took place.  Of the $20 million in new investments JTG had acquired from March to December 2005, approximately $4 million was sent to Horizon and $8 million was paid to JTG investors as purported interest on their investments.

Between May 2004 and December 2005, Midkiff and Watkins secured investors for sixteen Horizon programs in addition to the two CFS programs that were transferred to Horizon contracts.  With the eighteen programs combined, 519 individuals invested $30 million with Padanaram Trust and JTG.

## G.  Securities and Exchange Commission Freezes JTG's Assets

On December 7, 2005, the Securities and Exchange Commission (SEC) froze the assets of Horizon and JTG.  Horizon, Correll, JTG, Midkiff, and others were named as defendants in an SEC civil enforcement action issued that day.  After federal agents went to the JTG office in Blaine, Midkiff instructed Black, who worked from JTG's apartment office in Forest Lake, to move the business records from the office to a vacant apartment within the building.

## H.  Tax Consequences

Midkiff did not file tax returns or report his income to the Internal Revenue Service (IRS), despite earning significant income from the Horizon, CFS, and JTG schemes.  According to Midkiff, he was attempting to get his taxes in order when JTG's assets were seized and he no longer had access to any funds.

-8-

In January 2005, Midkiff hired IMF Decoders to assist in resolving his tax issues. For a fee, IMF Decoders "decoded" the individual master file (IMF) that he had requested and received from the IRS. Midkiff's IMF supposedly revealed that he was considered a citizen of the Virgin Islands and a manufacturer of automobile chassis. Throughout 2005 and 2006, Midkiff filed extensive tax protestor documents, including some that had been prepared by IMF Decoders. The IRS classified the documents as frivolous correspondence. According to Midkiff, he believed that he was resolving his tax issues.

## I. Midkiff Indicted on Charges Related to CFS and JTG

On December 12, 2006, Midkiff was indicted in the District of Minnesota on charges of mail fraud, wire fraud, promotional money laundering, conspiracy to commit mail fraud, and conspiracy to commit promotional money laundering. The charges related to the Horizon, JTG, and West Wing schemes for the time period of April 2004 through December 2005. Midkiff was also charged with four counts of failure to file income tax returns, in violation of 26 U.S.C. § 7203. The indictment alleged that Midkiff willfully failed to file tax returns for calendar years 2002 through 2005, despite the fact that he had received gross income in excess of $150,000 in 2002; $375,000 in 2003; $444,000 in 2004; and $1.5 million in 2005.

Midkiff moved for severance under Federal Rule of Criminal Procedure 8(a), contending that the tax counts were misjoined with the remaining counts in the indictment. Midkiff argued that there was no connection between the 2002 and 2003 failure-to-file charges and the fraud alleged in the indictment. With respect to the 2004 and 2005 tax counts, Midkiff acknowledged that the fraud scheme may have been a source of income for those years, but claimed that the offenses did not arise from the same transactions or acts and were not part of a common scheme or plan. In the alternative, Midkiff argued for relief from prejudicial joinder under Federal Rule

-9-

of Criminal Procedure 14.  In his report and recommendation, the magistrate judge[2] determined that the counts were properly joined and that there was no basis for Rule 14 relief.  The district court adopted the report and recommendation and denied Midkiff's motion.

Before trial, the government moved to dismiss the money laundering charges, and trial proceeded on the remaining twenty-one counts.

## II.  Discussion

### A.  Joinder of Tax Charges with Fraud Charges

Midkiff contends that the charges for failing to file tax returns were improperly joined with the fraud and conspiracy charges under Federal Rule of Criminal Procedure 8(a).  Alternatively, he contends that the tax charges should have been severed from the fraud charges under Federal Rule of Criminal Procedure 14 because joinder resulted in severe or compelling prejudice.

We review *de novo* a decision to join counts together into a single indictment. United States v. McCarther, 596 F.3d 438, 441 (8th Cir. 2010).  Rule 8(a) allows a single indictment to charge a defendant with multiple offenses if the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  "The rule is broadly construed in favor of joinder to promote judicial efficiency."  McCarther, 596 F.3d at 441-42.

---

[2]The Honorable Arthur J. Boylan, United States Magistrate Judge for the District of Minnesota.

-10-

Tax charges may be joined with fraud charges if the unreported income arises solely and directly out of the fraudulent scheme. United States v. Bibby, 752 F.2d 1116, 1121 (6th Cir. 1985); United States v. Kopituk, 690 F.2d 1289, 1313 (11th Cir. 1982); United States v. Kenny, 645 F.2d 1323, 1344 (9th Cir. 1981). When the unreported income is derived from the charged conduct, the tax offense is based on the same act or transaction as the other offenses. See Bibby, 752 F.2d at 1121; Kopituk, 690 F.2d at 1313; Kenny, 645 F.2d at 1344. Moreover, failure to file tax returns may have a logical and temporal relationship with the other offenses charged in the indictment such that the tax offenses are connected with or constitute parts of a common scheme or plan. See United States v. Johnson, 462 F.3d 815, 822 (8th Cir. 2006) (no error in joining drug and firearm offenses that were temporally and logically connected).

The 2004 and 2005 tax counts were based on the same act or transaction as the fraud counts. The indictment alleged that the fraud occurred from April 2004 to December 2005, that Midkiff derived income from the scheme underlying the fraud charges, and that he failed to report income for those calendar years. Because his unreported income was derived from the charged conduct, the 2004 and 2005 tax counts were properly joined with the fraud counts.

The 2002 and 2003 tax counts were connected to the remaining counts under a common scheme. The indictment detailed Midkiff's relationship with Horizon and Correll from 2002 to 2004, explaining that Midkiff had recruited investors and received $560,000 from Horizon. Although the indictment did not charge Midkiff with criminal counts of fraud or conspiracy for the 2002 to April 2004 time period, Midkiff's relationship with Horizon and the income he garnered from that relationship were the logical precursors to the fraud and conspiracy counts alleged in the indictment. The 2002 and 2003 tax counts thus were properly joined with the remaining charges.

-11-

The cases Midkiff cites for reversal are inapposite. Joinder was improper in those cases because the government failed to establish a nexus between the tax and non-tax offenses. See United States v. Diaz-Munoz, 632 F.2d 1330, 1335-36 (5th Cir. 1980) (misjoinder of tax counts with insurance fraud and embezzlement counts because the government failed to prove the illegally obtained proceeds were unreported on tax returns); United States v. Halper, 590 F.2d 422, 428-31 (2d Cir. 1978) (misjoinder of tax counts with Medicaid fraud counts because the income derived from the fraud did not constitute the unreported income); see also United States v. Randazzo, 80 F.3d 623, 627-28 (1st Cir. 1996) (misjoinder of tax counts with ninety-seven counts related to illegalities in the production of shrimp because the conduct underlying the offenses "was not part of the same 'scheme or plan' in any sense of the phrase"). We are satisfied that the government alleged and introduced proof sufficient to establish a nexus between the fraud, conspiracy, and Midkiff's failure to file tax returns, and thus we conclude that joinder of the offenses was proper.

Once the counts have been properly joined, the district court may order separate trials on individual counts if it appears that a defendant is prejudiced by joinder of the offenses. Fed. R. Crim. P. 14(a). "The decision of whether to sever a trial is left to the district court's sound discretion, and we will not reverse unless the defendant shows an abuse of discretion resulting in severe prejudice." United States v. Steele, 550 F.3d 693, 702 (8th Cir. 2008) (internal quotations and citations omitted).

> [P]rejudice may result from a possibility that the jury might use evidence of one crime to infer guilt on the other or that the jury might cumulate the evidence to find guilt on all crimes when it would not have found guilt if the crimes were considered separately. On the other hand, a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime.

United States v. Boyd, 180 F.3d 967, 981-82 (quoting United States v. Davis, 103 F.3d 660, 676 (8th Cir. 1996)).

If the district court had severed the charges, evidence of Midkiff's fraud crimes would have been probative and admissible at his tax trial, and evidence of his failure to file returns would have been probative and admissible in his fraud trial. To sustain a conviction of 26 U.S.C. § 7203, the government was required to prove that Midkiff willfully failed to file a tax return, despite an obligation to do so. See Cheek v. United States, 498 U.S. 192, 201 (1991) ("Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."); United States v. Gleason, 726 F.2d 385, 388 (8th Cir. 1984) (per curiam) ("The elements of violation of § 7203 are proof of failure to file the returns and willfulness in doing so.").

Evidence of the income derived from the fraudulent scheme established Midkiff's obligation to pay taxes, and evidence of the fraud was relevant to show that Midkiff's failure to file was willful. Midkiff contends that such evidence was unnecessary because Horizon had been reporting investment income to the IRS sufficient to trigger his obligation to file tax returns and because the government could have proved willfulness without evidence of the fraud. Although the government might have proved its case in the manner Midkiff suggests, it would not have been foreclosed from meeting its proof with evidence of the fraud and the income it generated. Similarly, evidence that Midkiff had failed to file taxes for 2002 through 2005 would have been admissible in a trial on the fraud and conspiracy charges as evidence of Midkiff's knowledge that his income was illegally derived or as evidence of his intent to conceal the fraud. See Fed. R. Evid. 404(b) (evidence of other crimes, wrongs, or acts admissible as proof of knowledge or intent).

Our review of the record satisfies us that the district court did not abuse its discretion in denying Midkiff's motion for severance. The evidence that Midkiff submitted tax protestor documents and engaged IMF Decoders to assist in dealing with his tax issues did not result in severe prejudice. Moreover, the district court instructed the jury that each crime should be considered separately and that its verdict of guilty on one count should not control its verdict on any other count. Accordingly, we affirm the district court's denial of relief from prejudicial joinder.

## B. Evidentiary Issues

Midkiff argues that it was reversible error for the district court to admit evidence that federal and state regulators had closed several companies that had previously employed Midkiff. He further contends that certain testimony unrelated to the charged conduct was erroneously admitted and that its cumulative effect amounted to prejudicial error. We review the district court's admission of evidence for abuse of discretion. United States v. Beason, 220 F.3d 964, 968 (8th Cir. 2000). If we conclude that the district court has abused its discretion with respect to an evidentiary ruling, "we will not reverse the conviction if the error was harmless." United States v. Lupino, 301 F.3d 642, 645 (8th Cir. 2002).

### 1. Evidence of Companies That Had Been Shut Down by Regulators

The government provided pretrial notice of intent to offer evidence under Federal Rule of Evidence 404(b). Specifically, the government sought to introduce evidence that Midkiff had been employed by companies that were later shut down for fraudulent practices. The government maintained that the evidence was *res gestae* and stated that it had submitted the notice out of an abundance of caution. The district court granted Midkiff's motion to exclude the evidence in part, but ruled that evidence that witnesses had purchased the companies' securities or viaticals from Midkiff would be admitted.

-14-

Before Midkiff took the stand, the government notified the district court that if Midkiff portrayed himself as an unsophisticated person, the government would request permission to cross-examine him about his previous employment with companies that had been shut down by state and federal regulators. Midkiff objected to that line of questioning on the basis of Federal Rules of Evidence 403 and 404(b). The district court reserved its ruling and instructed counsel to request a sidebar conference before delving into the topic.

Midkiff's defense to the fraud and conspiracy charges was that he did not have the requisite intent or knowledge to commit fraud. Midkiff claimed that he had trusted Correll, who had conned him. During direct examination, he testified, "I have to confess to you I'm not a businessman." He also testified that he did not know what a receiver was and that he thought that the SEC agents were trying to steal his business when they entered his office in December 2005.

During cross-examination, the government renewed its request to inquire about the companies that the SEC had placed into receivership because of their fraudulent activities. Midkiff reiterated his objection, arguing that the evidence was inadmissible character evidence and would not be relevant to Midkiff's knowledge during the time period relevant to the charged fraud and conspiracy. After the government represented that it had evidence that Midkiff knew the companies were shut down for fraudulent practices during the time period relevant to the case, the district court overruled the objection and admitted the evidence.

On cross-examination, Midkiff testified that he had sold products for Alpha Telecom, Mutual Benefits Corporation, Lifetime Capital, Accelerated Benefits Corporation, and ABC Viaticals, from 1995 until 2001. With respect to Alpha Telecom, Midkiff explained that he sold ownership interests in pay phones to investors, for which he received a commission. Midkiff stated that Alpha Telecom was shut down "in the 90s, 2000 maybe." Midkiff admitted that an action was filed

against him for disgorgement of profits from the pay phone business. Midkiff testified that he understood in April 2005 that Alpha Telecom was placed in receivership and that he had filed suit against the Alpha Telecom receiver.

Midkiff testified that the SEC had shut down Mutual Benefits Corporation and Lifetime Capital after he left their employment. In the case of Accelerated Benefits, he stated that he did not know it had been closed, although he knew the company had changed its name to ABC Viaticals and had transferred its corporate residence. Midkiff testified that he had learned only recently that ABC Viaticals had been shut down by the SEC.

The government contends that Midkiff opened the door to its cross-examination when he testified that he is not a businessman and that he did not know what a receiver was in December 2005. "The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination." United States v. Durham, 868 F.2d 1010, 1012 (8th Cir. 1989) (internal quotations and citations omitted). If the defendant has "opened the door" to objectionable evidence, there can be no reversible error. Beason, 220 F.3d at 968 (citing United States v. Finch, 16 F.3d 228, 233 (8th Cir. 1994) (under "opening the door" theory, evidence introduced must rebut something that has been elicited by defense counsel), and United States v. Womochil, 778 F.2d 1311, 1315 (8th Cir. 1985) (no abuse of discretion in allowing the government to clarify a false impression created on cross-examination)); see also Durham, 868 F.2d at 1012 (finding no abuse of discretion in allowing the government to clarify a false impression made by defense counsel's direct examination).

Midkiff opened the door to questions regarding his employment with Alpha Telecom by claiming he did not know what a receiver was. Midkiff's cross-examination testimony regarding Alpha Telecom directly controverted his previous

testimony. Midkiff admitted that he had worked for Alpha Telecom, that the company was closed for its fraudulent practices in the late 1990s or early 2000s, that he was sued for disgorgement of profits, and that he filed suit against the receiver in April 2005. The disputed testimony thus established that Midkiff knew what a receiver was before the SEC agents came to JTG's office and before he instructed the bookkeeper to move JTG's records.

The government's line of questioning regarding the remaining companies was limited to whether Midkiff had worked for the companies, what his position was, and whether the companies were closed for fraudulent practices. Midkiff's passing direct-examination testimony that he's "not a businessman" did not open the door so wide as to allow the testimony that Mutual Benefits Corporation, Lifetime Capital, Accelerated Benefits, and ABC Viaticals were shut down by regulators. Midkiff's testimony, however, was relevant to the knowledge and intent issues raised by his defense that he was not a part of the fraud but was conned by Correll. See Fed. R. Evid. 404(b) (Evidence of prior bad acts is admissible to establish "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.").

The problem with the government's cross-examination was that there was no evidence linking Midkiff to the fraudulent schemes that resulted in the companies' closures. Proof connecting the defendant to the prior bad act is required for the evidence to be relevant. United States v. Mihm, 13 F.3d 1200, 1205 (8th Cir. 1994); see also Huddleston v. United States, 485 U.S. 681, 689 (1988) (concluding that the government may not "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo"). We have noted that in situations such as this, "the district court would have been better advised to conditionally receive this evidence subject to the government providing sufficient linkage to [the defendant]." Mihm, 13 F.3d at 1205.

We conclude that although Midkiff's testimony about Mutual Benefits Corporation, Lifetime Capital, Accelerated Benefits Corporation, and ABC Viaticals should not have been admitted, the error was harmless. "The test for harmless error is whether the erroneous evidentiary ruling had a substantial influence on the jury's verdict." Lupino, 301 F.3d at 645 (internal quotations and citations omitted). In light of the abundant evidence to sustain Midkiff's convictions, we conclude that any error in admitting the challenged evidence did not affect Midkiff's substantial rights and thus does not merit reversal. See United States v. Smith, 573 F.3d 639, 656 (8th Cir. 2009) (concluding that any evidentiary error was harmless in light of the extensive testimony and documentary evidence that the government presented over the course of more than twenty days of trial).

## 2. Disputed Investor Testimony

During the course of the trial, numerous investors testified about their investments with Midkiff. Their testimony typically focused on how they came to invest with Midkiff, the representations Midkiff had made about the investment programs, the amount of money they invested, and the amount they lost. According to the investors, Midkiff encouraged them to seek out different sources of investment capital. Investors used home sale proceeds, took out home equity loans, and utilized credit card advances to invest with Midkiff. Investors understood that the investment programs were open only for a limited time, and Midkiff encouraged them to submit their investment principal quickly. Midkiff told investors that their principal was safe and that they could withdraw their principal after completion of their investment contract.

One investor testified that Midkiff had given him information on a method to avoid a mortgage obligation. A different investor mentioned that he had lost a significant amount of money in a failed deepwater port investment that he had made with Midkiff that was unrelated to the Horizon, West Wing, or JTG schemes. A third

investor testified that Midkiff had been investigated for "some problems he had had in the past in Texas." There was also testimony that Midkiff had engaged in what one witness thought was a tax scam and that Midkiff had referred an investor to a tax consultant who the investor thought was trying to circumvent the tax system.

Any error in admitting the investors' testimony regarding the mortgage avoidance scheme, the deepwater port investment, the problems Midkiff had in Texas, and the tax referral and scheme was harmless. Viewing the evidentiary record as a whole, the investors' testimony about the disputed topics was minimal and the strength of the government's case against Midkiff was overwhelming.

## C. Sentence

Midkiff contends that his 180-month sentence is unreasonable because the district court did not properly evaluate the 18 U.S.C. § 3553(a) factors and did not give sufficient weight to his unique, personal circumstances, including the positive role he had played in the lives of many people.

The Presentence Investigation Report (PSR) concluded that Midkiff's total offense level was forty-seven and that he was subject to life imprisonment. The district court disagreed with a number of the enhancements applied in the PSR and determined that Midkiff's total offense level was forty-one and his criminal history category was I, resulting in a guideline sentence of 324 to 405 months' imprisonment. Midkiff asked for a sentence of substantially less than twelve years, in part because Correll had been sentenced to 144 months' imprisonment. Midkiff also argued that a sentence below guidelines range would be appropriate because he had performed numerous good works.

The district court engaged in a lengthy discussion with counsel and Midkiff about Midkiff's offense conduct and the effect of the guidelines, concluding that under the guidelines, "you could have ended up with a life sentence and that would

-19-

have been totally inappropriate." Throughout the sentencing proceedings, the district court expressed its concern that a guidelines-range sentence would result in a term of imprisonment longer than the sentences imposed on the individuals behind much larger fraud schemes. In its written statement of reasons for imposing sentence, the district court explained that Midkiff's abuse of position of trust and his obstructive behavior warranted a sentence longer than that imposed on Correll, but that the guideline sentence of at least 324 months "is excessive and is not necessary to meet the statutory goals of sentencing." The district court "thus sentenced the Defendant so as to avoid sentencing disparities while taking into consideration the Defendant's specific offense conduct." After taking into consideration the factors outlined in § 3553(a), the district court sentenced Midkiff to 180 months' imprisonment.

Our review of Midkiff's sentence is limited to determining whether it is reasonable. United States v. Gall, 552 U.S. 38, 46 (2007). We review the reasonableness of a defendant's sentence under a "deferential abuse-of-discretion standard," ensuring that the district court committed no significant procedural error and that the sentence is substantively reasonable. Id. at 41, 51. Procedural error occurs when the district court fails to calculate (or improperly calculates) the guidelines range, treats the guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the defendant's sentence. Id. at 51.

The district court committed no procedural error in sentencing Midkiff. It properly calculated the guidelines range and recognized that the guidelines were advisory. The sentencing transcript reflects the district court's intimate knowledge and careful consideration of the circumstances of this case. Moreover, the district court's written statement of reasons reviewed the 3553(a) factors and further explained their application to Midkiff's sentence. Although Midkiff disagrees with the district court's evaluation of the relevant facts, the district court did not rely on any clearly erroneous facts that would justify reversal.

Midkiff's sentence was also substantively reasonable. Although Midkiff believed that his charitable deeds should have been given greater weight, the district court did not find his arguments for leniency sufficiently compelling to warrant a greater variance and did not abuse its discretion in determining the extent of the variance. See United States v. Price, 542 F.3d 617, 622 (8th Cir. 2008) (holding that a below-guidelines-range sentence was substantively reasonable and within the district court's discretion).

## III. Conclusion

The judgment is affirmed.

_____